# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-1004EA

_____

| | | |
|---|---|---|
| Little Rock Family Planning Services, P.A.; Curtis E. Stover, M.D., on behalf of himself and the patients he serves; William Harrison, M.D., on behalf of himself and the patients he serves; Tom Tvedten, M.D., on behalf of himself and the patients he serves; and Max Baldwin, M.D., on behalf of himself and the patients he serves, | * * * * * * * * * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | |
| | * | On Appeal from the United |
| | * | States District Court |
| Larry Jegley, Prosecuting Attorney for Pulaski County, in his official capacity, his agents and successors; and Terry Jones, Prosecuting Attorney for Washington County, in his official capacity, his agents and successors, | * * * * * * | for the Eastern District of Arkansas. |
| | * | |
| Appellants, | * | |
| | * | |
| Ray Jouett, Chair of the Arkansas State Medical Board, in his official capacity, his agents and successors, | * * * | |
| | * | |
| Defendant, | * | |
| | * | |
| | * | |

----------------------          *
                                *
Arkansas Right to Life Political  *
Action Committee,                 *
                                *
    Amicus on Behalf of Appellant.    *

_____

Submitted: April 19, 1999

Filed: September 24, 1999

_____

Before RICHARD S. ARNOLD and WOLLMAN,[1] Circuit Judges, and MAGNUSON,[2] District Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.


The defendants appeal a District Court[3] decision holding Arkansas's Partial-Birth Abortion Ban Act of 1997 unconstitutional and permanently enjoining enforcement of the Act. This opinion is filed jointly with Carhart v. Stenberg, __ F.3d __, Nos. 98-3245, 98-3300 (8th Cir. Aug. __, 1999), holding Nebraska's "partial-birth abortion" ban unconstitutional. Although the language used in the Arkansas statute differs somewhat from the language in the Nebraska statute, the statutes seek to do the same thing – ban

_____

[1]The Hon. Roger L. Wollman became Chief Judge of this Court on April 24, 1999.

[2]The Hon. Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

[3]The Hon. Jerry W. Cavaneau, United States Magistrate Judge for the Eastern District of Arkansas.

"partial-birth abortion." The differences between the two statutes are not significant, and we reach the same result in both cases. For the following reasons, and on the basis of Carhart, we affirm the judgment of the District Court.

The central difficulty with the Arkansas statute is that it covers too much. The statute makes it a crime to perform "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before taking the life of the fetus and completing the delivery . . .." Ark. Code Ann. § 5-61-202 (1997). The term "partial-birth abortion," however, is commonly understood to refer to a particular procedure also known as intact dilation and extraction (D&X). The accepted description of this procedure is much more specific and much narrower than the definition of "partial-birth abortion" given in the Arkansas law. As defined by the American College of Obstetricians and Gynecologists, an intact D&X combines four elements, in the following order:

1.      deliberate dilatation of the cervix, usually over a sequence of days;

2.      instrumental conversion of the fetus to a footling breech;

3.      breech extraction of the body excepting the head; and

4.      partial evacuation of the intracranial contents of a living fetus to
        effect vaginal delivery of a dead but otherwise intact fetus.

The key difference between the definition in the Arkansas statute and the definition given by ACOG is made clear by the third numbered element of a D&X as defined by ACOG. The definition contemplates removal from the womb of the fetus's entire body except for the head. The Arkansas statute, on the other hand, requires only that a fetus be "partially" delivered. The word "partially" refers to any part of the fetus, or, at least, any substantial part. It is not limited to delivery of the entire fetus except for the head. As we shall explain, "partial" delivery occurs as part of other recognized

abortion procedures, methods that are concededly constitutionally protected. Under precedents authoritatively laid down by the Supreme Court, which it is our duty to follow, such a prohibition is overbroad and places an undue burden on the right of a woman to decide whether to have an abortion.

Can the statute be saved by interpreting it to apply only to a D&X as defined by ACOG? We think not. Such an interpretation, of course, would raise a different, and perhaps closer, constitutional question, but it would also do violence to the words of the statute as enacted by the General Assembly. The word "partially" cannot, by the ordinary process of construction, be converted into "all of the fetus except for the head." We express no view on whether a statute so limited would be valid. That question is not presented by the case before us. We hold only that the statute actually enacted contains a much broader prohibition, and is therefore invalid.

## I.

On April 1, 1997, Arkansas's Governor signed into law Act 984, the Partial-Birth Abortion Ban Act of 1997. The Act provides:

> (a) Whoever knowingly performs a partial-birth abortion and thereby takes the life of a human fetus shall be guilty of a Class D felony. . . .
>
> (c) It is an affirmative defense to a prosecution under this section, which must be proved by a preponderance of the evidence, that the partial-birth abortion was performed by a physician who reasonably believed:
>
>> (1) The partial-birth abortion was necessary to save the life of the woman upon whom it was performed; and
>>
>> (2) No other form of abortion would suffice for that purpose.

Ark. Code Ann. § 5-61-203 (1997).  The Act defines "partial-birth abortion" as:

> an abortion in which the person performing the abortion partially vaginally delivers a living fetus before taking the life of the fetus and completing the delivery or as defined by the United States Supreme Court.

Ark. Code Ann. § 5-61-202 (1997).  In addition to committing a felony, a physician who knowingly performs a "partial-birth abortion" is subject to disciplinary action by the State Medical Board.  See id. § 5-61-204.

On July 11, 1997, Little Rock Family Planning Services, and the four named plaintiffs, all of whom provide abortion services in Arkansas, filed a complaint challenging the constitutionality of the Act.  The District Court granted  a temporary restraining order against enforcement of the Act, and, in a subsequent combined preliminary-injunction hearing and trial on the merits, permanently enjoined enforcement of the Act.

The District Court held the Act unconstitutional for three reasons:  because it was unconstitutionally vague; because it imposed an undue burden on women seeking abortions; and because it did not adequately protect the health and lives of pregnant women.  We agree that the Act imposes an undue burden on women seeking abortions and therefore hold the Act unconstitutional.  Because we base our holding on undue-burden grounds, as we did in Carhart, we do not decide the vagueness issue, or whether the Act fails to provide adequate protection for the health and lives of pregnant women.

## II.

The District Court's findings are not clearly erroneous, and we therefore state the facts as found by the Court.  The four named plaintiff physicians all perform abortions, primarily in clinic settings.  Dr. William Harrison provides abortion services in

Fayetteville, Arkansas. Dr. Curtis Stover, the owner and director of Little Rock Family Planning Services, provides services in Little Rock, Arkansas. Drs. Maxwell Baldwin and Tom Tvetden also provide services in Little Rock. The gestational age[4] up to which each of the physicians perform abortions varies. Dr. Tvetden does not perform procedures past fifteen weeks, and Drs. Stover and Harrison do not perform abortions past twenty weeks, although Dr. Harrison has performed one abortion at twenty-two weeks. The majority of the abortions performed by Dr. Baldwin are prior to twelve weeks, but he does perform abortions at later gestational ages in some circumstances. All of the abortions about which evidence was taken in this case are of non-viable fetuses.

The plaintiffs use two methods of abortion which they believe are directly affected by the Act: the suction-curettage procedure and the D&E procedure. Dr. Harrison testified that he is not aware of any physicians in Arkansas who use the D&X procedure. Any physician who did perform a D&X procedure would be affected by the Act, as would the physician's patients. As we shall explain, the Act also affects physicians who perform the D&E procedure and, in some instances, the suction-curettage procedure as well.

The most common method used for abortions performed up to twelve weeks' gestation is the suction-curettage procedure. During this procedure, the physician gradually dilates the cervix and then inserts a clear plastic tube, known as a cannula, through the vagina into the uterus. The cannula is attached to a vacuum device which is used to remove the fetus. Although the D&E procedure is the most common method of second-trimester abortions, suction curettage can also be used in some second-trimester abortions, with the use of a larger cannula. A fetus removed by suction curettage at this stage does not usually remain intact. Part of the fetus may remain in

_____

[4]Gestational age is measured from the first day of the woman's last menstrual period.

the uterus while another part is being drawn into and through the vagina. Some physicians may also perform second-trimester abortions with a combination of suction and the use of forceps.

In a D&E procedure, the physician inserts forceps into the uterus, grasps a part of the fetus, commonly an arm or a leg, and draws that part out of the uterus into the vagina. Using the traction created between the mouth of the cervix and the pull of the forceps, the physician dismembers the fetal part which has been brought into the vagina, and removes it from the woman's body. The rest of the fetus remains in the uterus while dismemberment occurs, and is often still living.[5]

In second-trimester abortions performed at a gestational age of approximately eighteen to twenty-four weeks, the D&X procedure may also be used. As we have noted, ACOG provides the clearest explanation of this procedure:

> deliberate dilation of the cervix, usually over a sequence of days; instrumental conversion of the fetus to a footling breech; breech extraction of the body excepting the head; and partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

Trial Ex. App. 46.

In both the suction-curettage procedure and the D&E procedure, as well as in the D&X procedure, fetal death will occur after the physician has started the procedure.[6]

---

[5]A fetus is considered alive if it has a heartbeat. See Harrison's Dep. 14; Baldwin's Dep. 31; Stover's Dep. 28.

[6]In those cases in which fetal death has occurred prior to the start of the procedure, the Act would not apply, because the physician performing the abortion would not deliver a "living" fetus, as required by the Act.

In all three procedures, part of a living fetus may be brought out of the uterus into the vagina.  In a suction-curettage procedure where the fetus does not remain intact, part of the fetus which is still living may be drawn into the vagina before fetal demise occurs.  Baldwin's Dep. 29.  In a D&E procedure, part of the fetus is brought into the vagina before it is dismembered, leading to fetal demise.  In a D&X procedure, fetal demise will occur sometime after the cranial contents have been evacuated.  The physician does not generally know exactly when fetal death occurs.  See Harrison's Dep. 14; Stover's Dep. 28-29; Baldwin's Dep. 218-29; Quirk's Dep. 32.  It is generally, however,  after part of the fetus has been brought out of the uterus into the vagina.

III.

The substantive law governing the regulation of abortion discussed in Carhart applies here as well.  See Carhart, ___ F.3d at ___, slip op. at 11-16.  If a law attempting to regulate abortion creates an undue burden on a woman seeking an abortion, the law is unconstitutional.  See Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 876 (1992).  The District Court determined that Arkansas's "Partial-Birth Abortion Ban Act" created an undue burden, because it would ban both the D&E procedure and, in some circumstances, the suction-curettage procedure, and therefore held the Act unconstitutional.

The D&E procedure is the most common procedure for second-trimester abortions.  Some physicians also use the suction-curettage procedure, or a combination of the two procedures, to abort a fetus during the second-trimester.  If these procedures are barred by the Act, an undue burden is created for a woman seeking a second-trimester abortion for a nonviable fetus.  See Carhart, ___ F.3d at ___, slip op. at 16.  The Act prohibits "partially vaginally deliver[ing] a living fetus before taking the life

of the fetus and completing the delivery . . ..'' Ark. Code Ann. § 5-61-202 (1997).[7] The State argues that the Act is "aimed at" prohibiting the D&X procedure, and that the Act prohibits only that procedure. See Appellants' Br. 12-13, 26. The Act does not, the State argues, prohibit any other abortion procedure. As in the Nebraska statute considered in Carhart, however, the language of the Act encompasses more than just the D&X procedure.

The basis for our holding in Carhart that the Nebraska statute was unconstitutional was that the "substantial portion" language of the statute created a ban on more than just the D&X procedure. See Carhart, ___ F.3d at ___, slip op. at 15. The Nebraska statute prohibited intentionally bringing a substantial portion of a living fetus into the vagina for purposes of performing a procedure that would kill the fetus. That language effectively banned the D&E procedure, as well as the D&X procedure, because a physician performing a D&E procedure commonly brings an arm or a leg of living fetus – constituting a "substantial portion" – out of the uterus into the vagina, prior to dismemberment.

The Arkansas Act does not include the "substantial portion" language. It does, however, prohibit "partially vaginally deliver[ing] a living fetus before taking the life of the fetus and completing the delivery . . ..'' Ark. Code Ann. § 5-61-202 (1997). The

---

[7]The Act's definition goes on to say: "or as defined by the United States Supreme Court." We are not sure what this phrase means. It appears to say that the Supreme Court of the United States may supply a definition of "partial-birth abortion" different from the one contained in the Act. Perhaps the Legislature intended to allow the Supreme Court to narrow the definition, if such a narrowing construction would render the Act valid. In any case, we do not see how this phrase can help the State at the present stage of the case. If the Legislature has made a delegation, it is only to the Supreme Court, not to the lower federal courts. And, as we have explained, we do not think the word "partially," as a matter of the English language, can be read as synonymous with the ACOG definition, and as covering nothing else.

problem here is the word "partially." In the context of the Act, "partially" is not appreciably different from "substantial portion." The effect is the same. A physician who, as part of a D&E procedure, or as part of a suction-curettage procedure, brings an arm or a leg or some other part of a living fetus out of the uterus into the vagina will violate the Act.

The State argues that the Act's scienter requirement limits the Act's scope to prohibiting only the D&X procedure. The argument fails, as it did in Carhart. See Carhart, ___ F.3d at ___, slip op. at 15-16. The Act prohibits "knowingly" performing a "partial-birth abortion." Using the definition of "partial-birth abortion" provided in the Act, any physician who knowingly partially vaginally delivers a living fetus, then takes the life of the fetus, and completes delivery, violates the Act. Because both the D&E procedure and the suction-curettage procedure used in second-trimester abortions often include what the Act prohibits, physicians performing those procedures will violate the Act.

IV.

The State also argues that Roe and Casey do not apply to the Act because Roe and Casey apply only to the unborn, while the Act concerns "partially born" human beings. For the reasons discussed in part VI of Carhart, we reject this argument. See Carhart, ___ F.3d at ___, slip op. at 17.

For the foregoing reasons, we affirm the judgment of the District Court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-